**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | **Under Seal** |
| v. | 1:26-MJ-112 |
| LATAIJA ANCRUM, | |
| *Defendant*. | |

**AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Kyle C. Van Hecke, being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      This affidavit is submitted in support of a criminal complaint and arrest warrant charging that, beginning in or around August 2023 and continuing to in or around August 2024, within the Eastern District of Virginia and elsewhere, the defendant, LATAIJA ANCRUM, knowingly and intentionally combined, conspired, confederated, and agreed with others known and unknown to distribute 400 grams or more of a mixture and substance containing fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

2.      I have been a Special Agent with the Drug Enforcement Administration (DEA) since August 9, 2023. I am currently assigned to the DEA High Intensity Drug Trafficking Area Task Force located in Reston, Virginia. During my time in law enforcement, I have assisted in the application for search warrants and have participated in the execution of numerous arrest and search warrants in the investigation of narcotics and organized crime related offenses, resulting in the prosecution of numerous individuals and the seizure of illegal drugs, weapons, stolen property, and other evidence of criminal activity.

1

3.      I graduated from the DEA Academy on August 9, 2023. The extensive training that I completed at the DEA Academy consisted of 76 hours of academic instruction on topics including, but not limited to: drug identification, case management, search warrant management, social media, digital evidence, and interview and interrogation techniques. I also received 98 hours of legal training focused on Title 21 of the United States Code, 73 hours of training in surveillance and operations planning, 136 hours of training in raids and defensive tactics, and 124 hours of firearms training. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Based on my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by drug traffickers and abusers of controlled dangerous substances.

4.      Based on my participation in investigations of narcotics trafficking organizations, I have gained knowledge and experience in the use of various investigative techniques, including physical surveillance, undercover agents, confidential sources, the controlled purchase of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.

5.      Law enforcement officers utilized two DEA Confidential Sources, identified herein as "CS-1" and "CS-2", during this investigation.  For this affidavit, these individuals will be referred to in the masculine gender regardless of their true gender.  During the time that CS-1 and CS-2 were cooperating with law enforcement, they provided information which has proven to be truthful and to the extent possible has been corroborated through various investigative techniques and independent investigation.  To my knowledge, none of the information provided to me or any

2

other members of law enforcement by CS-1 and CS-2 proved to be false, misleading, or inaccurate in any material respect.

6.      The facts and information contained in this affidavit are based on my personal knowledge of the investigation and information obtained from other law enforcement officers.  All observations not personally made by me were relayed to me by the individuals who made them, or they are based on my review of reports, documents, and other physical evidence obtained during the course of the investigation.

7.      This affidavit contains information necessary to support probable cause.  The information contained in this affidavit is not intended to include each and every fact observed by me or known to the government.

**PROBABLE CAUSE**

8.      The investigation revealed a drug trafficking conspiracy involving ANCRUM, KHALIL WILLIAMS, ALHAGI CONTEH, SAMUEL VAZQUEZ, and others.  ANCRUM, based in Fredericksburg, Virginia with husband and co-conspirator WILLIAMS, laundered drug proceeds and moved drug proceeds between Eastern District of Virginia (EDVA) based redistributors and co-conspirators in Phoenix, Arizona, while her husband and co-conspirator, WILLIAMS redistributed fentanyl pills in EDVA.  After ANCRUM sent payments to Phoenix-based co-conspirators, VAZQUEZ and others mailed parcels containing fentanyl pills to WILLIAMS in Virginia.  WILLIAMS and Virginia-based co-conspirator CONTEH then redistributed those fentanyl pills in EDVA, including to confidential sources acting at the direction of law enforcement, between at least February 2024 and August 2024.  ANCRUM also received drug payments from CONTEH and others on WILLIAMS' behalf for fentanyl pills.  WILLIAMS, CONTEH, and VAZQUEZ all subsequently pled guilty to conspiracy to distribute 400 grams or

3

more of fentanyl and distribution of fentanyl.[1]

### A. *Money transferred from ANCRUM to Phoenix-based co-conspirators*

9.        ANCRUM and WILLIAMS each maintained their own individual CashApp accounts.  ANCRUM's account bears the display name "Taay," which is ANCRUM's nickname; WILLIAMS' account bears the display name "John Doe."  ANCRUM and WILLIAMS' respective account profiles bear their respective full names, dates of birth, social security numbers, addresses, driver's licenses, and multiple uploaded "selfie" images, which confirm they are the actual users of their accounts.

10.        Additional information confirms that ANCRUM is the actual user of her CashApp account.  First, WILLIAMS frequently directed co-conspirators to send their drug payments directly to ANCRUM.  On one such occasion, on May 31, 2023, WILLIAMS provided ANCRUM's phone number to a co-conspirator, saying "u tryin send to my girl" then "Iont even kno how use this Apple Pay shit lls she be doin it."  Additionally, prior to WILLIAMS' arrest on August 14, 2024, many peer-to-peer comments left on ANCRUM's CashApp account were addressed to ANCRUM and not WILLIAMS.  For example, on February 2, 2024, ANCRUM received the peer-to-peer comment "tell ur mans to hmu plz;", "ur mans" is referring to WILLIAMS and "hmu" means "hit me up."  In other words, the sender is asking ANCRUM to tell WILLIAMS to contact the sender.  Even though the message is for WILLIAMS, the sender clearly understands that ANCRUM, not WILLIAMS, will receive the message.  In another instance, on

---

[1] CONTEH pled guilty to conspiracy to distribute 400 grams or more of fentanyl and distribution of fentanyl, and on October 22, 2024, he was sentenced to 120-months imprisonment and five years of supervised release. EDVA Case No. 1:24-cr-140. WILLIAMS pled guilty to the same charges as CONTEH, and on February 19, 2025, he was sentenced to 120-months imprisonment and five years of supervised release. EDVA Case No. 1:24-cr-236. VAZQUEZ also pled guilty to the same two charges, and on February 10, 2026, he was sentenced to 24-months imprisonment and five years of supervised release. EDVA Case No. 1:25-CR-277.

August 8, 2024, WILLIAMS sent $220 to ANCRUM with the peer-to-peer comment "send to my mom." On the same date, approximately one minute later, ANCRUM sent $220 to WILLIAMS' mother with the peer-to-peer comment "from Khalil." Finally, WILLIAMS' CashApp account activity ceased coinciding with his arrest on August 14, 2024. ANCRUM's CashApp account activity, however, continued after WILLIAMS' arrest.

11.    Agents reviewed ANCRUM's previously attempted CashApp peer-to-peer payments. From on or about September 22, 2023 to February 21, 2024, approximately five months' time, on CashApp alone, ANCRUM transferred at least $50,200 to two Phoenix-based co-conspirators in round dollar amounts generally between $1,000 and $5,000. On one such occasion, on September 22, 2023, based on a review of WILLIAMS' and ANCRUM's iCloud accounts, WILLIAMS texted ANCRUM the CashApp account of a Phoenix-based co-conspirator ("CC-1"). Within one minute, ANCRUM responded with a screenshot of CC-1's CashApp account followed by a screenshot of their bank accounts showing how much money they had available. Approximately nine minutes later, WILLIAMS responded to ANCRUM with "you can send it," then "4500". Approximately three minutes later, ANCRUM texted back a screenshot of a $4,500 payment to CC-1. During such timeframe, Virginia Employment Commission records indicate that neither ANCRUM nor her husband, WILLIAMS, had any reported legitimate employment income.

12.    Approximately five days after ANCRUM sent $4,500 to CC-1, on September 27, 2023, WILLIAMS texted ANCRUM a photograph of a receipt for a U.S. Postal Service (USPS) parcel destined for Stafford, Virginia with an expected delivery date of September 28, 2023. On October 4, 2023, approximately six days after the delivery date, WILLIAMS asked ANCRUM to send a video of "them" so he can show someone. ANCRUM responded with the photograph

included below of fentanyl pills on a countertop.  Based on my training and experience and knowledge of this case, ANCRUM likely paid CC-1 for fentanyl pills on September 22, 2023, which were shipped from Arizona to Virginia, arriving on September 28, 2023.  ANCRUM then provided a photograph of the same fentanyl pills to WILLIAMS on October 4, 2023 so WILLIAMS could show them to someone interested in those pills.  Furthermore, based on the execution of a search warrant in 2024, the countertop in the photograph matched the countertops in the residence that ANCRUM and WILLIAMS previously shared in Fredericksburg, Virginia for which ANCRUM was the lessee.



13.     Months later, on June 19, 2024, another Phoenix-based co-conspirator ("CC-2") sent the following peer-to-peer comment to ANCRUM: "lmk if u need I got u for da low low .27 to .32."  Based on my training and experience, I know that drug traffickers often attempt to conceal their activities by speaking in vague, coded language.  CC-2 is offering ANCRUM fentanyl pills for $0.27–0.32 each, depending on quantity ordered, and marketing that price as "low low."  On the same date, ANCRUM texted WILLIAMS a screenshot of the peer-to-peer comment.

WILLIAMS asked ANCRUM what he should do.  ANCRUM then directed WILLIAMS to call her later so that they could discuss a plan.  Later the same day, WILLIAMS responded to CC-2 about the price.

14.     Approximately one month later, CC-2 was arrested in Arizona by the Mesa Police Department.  CC-2 was later found guilty of possession of narcotics for sale, and possession or use of a weapon in a drug offense.

**B.  *Money transferred from CONTEH to ANCRUM***

15.     During the conspiracy, co-conspirator CONTEH maintained a CashApp account bearing the display name "sixowe_mk". The profile for this account bears CONTEH's full name, date of birth, social security number, former address, driver's license, and an uploaded "selfie" image of CONTEH.  From August 21, 2023, to April 2, 2024, CONTEH transferred at least $13,620.00 to ANCRUM in round dollar amounts generally between $650 and $2,200 and usually containing the peer-to-peer comment "rent," a common covert term for a drug payment.  During the same timeframe, a DEA Confidential Source ("CS-1") conducted multiple controlled purchases of fentanyl pills from CONTEH starting in February 2024 and culminating with CONTEH's arrest on April 12, 2024.

16.     In one instance, on January 30, 2024, CONTEH sent ANCRUM $1,000 via CashApp with the peer-to-peer comment "rent."  Three days later, on February 2, ANCRUM transferred the same amount, $1,000, to CC-2 in Phoenix.  Based on my training and experience, this behavior is consistent with ANCRUM receiving drug proceeds and facilitating the shipment and distribution of fentanyl pills from CC-2 to her co-conspirators in Virginia.

**C.  *February 23, 2024 controlled purchase from CONTEH***

17.     On February 21, 2024, CONTEH again sent ANCRUM $1,000 via CashApp with the peer-to-peer comment "rent."  Moments later, ANCRUM texted WILLIAMS to confirm that

7

she had received CONTEH's payment.  At that time, CONTEH was paying $1.00 per fentanyl pill. Accordingly, on February 21, 2024, CONTEH was likely paying ANCRUM $1,000 for 1,000 fentanyl pills received from WILLIAMS, CONTEH's source of supply.  On the same date, ANCRUM again transferred the same amount, $1,000, to CC-2 in Phoenix.

18.     Two days later, on February 23, 2024, CS-1 purchased approximately 1,000 fentanyl pills from CONTEH for $1,200 in Woodbridge, Virginia.  Based on my training, experience, and knowledge of this investigation, I believe the same fentanyl pills that CONTEH sold to CS-1 were supplied to CONTEH by WILLIAMS and ANCRUM on February 21. Those fentanyl pills were submitted to the DEA's Mid-Atlantic Regional Laboratory for analysis and safekeeping; results revealed the pills contained 94.93 net grams of fentanyl.

**D.  *March 26, 2024 controlled purchases from CONTEH***

19.     On March 26, 2024, CONTEH told CS-1 via telephone that "[his] man just got the package," and CONTEH instructed CS-1 to get $2,500 from the bank and give it to CONTEH. CONTEH explained to CS-1 that he would then drive to Fredericksburg, Virginia with the money to meet with his source of supply, WILLIAMS, so that he could obtain 2,000 fentanyl pills, and then return to CS-1 with the 2,000 pills.  Based on my training, experience, and knowledge of this investigation, I believe that CONTEH saying his "man just got the package" referred to WILLIAMS receiving a parcel containing counterfeit pills containing fentanyl.

20.     On March 26, 2024, the day of the controlled purchase, law enforcement searched CS-1 to ensure he did not have any contraband or currency.  CS-1 then departed the neutral site enroute to meet CONTEH at the deal location.

21.     At approximately 1:05pm, prior to CS-1 arriving at the deal location, agents conducting physical surveillance at the deal location located CONTEH's vehicle (hereinafter, "V1") in a parking lot in Woodbridge, Virginia, with the engine on.  At approximately 1:16pm,

8

agents observed CS-1's vehicle arrive and park near V1.  Immediately after, agents observed CS-1 exit CS-1's vehicle and enter V1 holding the marked envelope containing $2,500 in hand.  A short time later, CS-1 exited V1 with no envelope in hand and returned to CS-1's vehicle.

22.    At approximately 1:20pm, agents observed V1 depart the parking lot.  Agents conducted mobile surveillance on CONTEH in V1 as he drove south to Fredericksburg, Virginia on I-95 and Route 1.

23.    Once in Fredericksburg, VA, at approximately 1:46pm, agents observed CONTEH park V1 in a parking lot by Warrenton Road in Fredericksburg, Virginia, and remain in V1.

24.    At 1:50pm on the same date (approximately four minutes later), CONTEH "started sharing location" with WILLIAMS' phone number.

25.    At approximately 2:05pm, WILLIAMS texted CONTEH saying "Otw", meaning on the way.  A few seconds later, also at approximately 2:05pm, WILLIAMS texted a screenshot indicating he was on a phone call with another contact.  A few seconds later, also at approximately 2:05pm, CONTEH replied "Oready", a term CONTEH frequently used to indicate he understands.

26.    At approximately 2:14pm, CONTEH texted WILLIAMS "I'm behind the store."

27.    At approximately 2:15pm, agents observed a Black Toyota Avalon (hereinafter, "V2") enter the same parking lot and park in the spot directly next to V1.  Immediately after V2 parked, agents observed CONTEH exit V1 and approach V2.  At the same time, agents saw WILLIAMS exit V2 and approach CONTEH.  WILLIAMS was described as approximately 6'0" tall, scrawny build, with short braids and was positively identified based on law enforcement surveillance, car registration data, and comparison with WILLIAMS' driver's license photograph.

28.    At approximately 2:19pm, agents observed CONTEH depart in V1 and WILLIAMS depart in V2.  Also, at 2:19pm, as soon as CONTEH got back into V1, CONTEH

9

called CS-1 and told him he was driving back to Woodbridge, Virginia.  Later, CONTEH, still driving back to Woodbridge, Virginia, requested that they meet back up at a convenience store in Woodbridge, Virginia, within EDVA.

29.     Based on my training, experience, and knowledge of this investigation, I believe that CONTEH drove to Fredericksburg to obtain fentanyl pills from his source of supply, WILLIAMS, to sell to CS-1.

30.     Prior to CS-1 arriving at the new meet location, agents maintained physical surveillance of V1, which arrived and parked at the new meet location.  A short time later, agents observed CS-1's vehicle arrive and park near V1.  Immediately after, agents observed CS-1 exit CS-1's vehicle and enter V1.  A short time later, CS-1 exited V1 with a small white bag in hand and returned to CS-1's vehicle.

31.     After completing the purchase from CONTEH, CS-1 provided law enforcement with approximately 2,000 blue pills. The pills were submitted to the DEA's Mid-Atlantic Regional Laboratory for analysis and safekeeping; results revealed the pills contained 190.41 net grams of a substance containing fentanyl.

32.     On the same date, a few hours after the controlled purchase, WILLIAMS contacted CONTEH about an outstanding bill of $200. CONTEH and WILLIAMS proceeded to argue over a price of $1.00 or $1.10.  Based on my training and experience, WILLIAMS and CONTEH were arguing about the price per pill from the deal earlier that day.  WILLIAMS argued that the price was $1.10 and claimed he communicated that clearly to CONTEH.  A price difference of $.10 per pill on a sale of 2,000 pills would result in a $200 outstanding debt.  These communications also suggest that CONTEH previously received pills from WILLIAMS for $1.00 per pill and $1.10 represented a price increase.

**E.**        ***CONTEH's resupply from WILLIAMS and ANCRUM on March 31, 2024***

33.        On March 30, 2024, at approximately 12:54pm, CONTEH messaged WILLIAMS and said, "Need u".  Seconds later, WILLIAMS responded, "…call me".  Based on my training, experience, and knowledge of this investigation, I interpret this to mean that CONTEH wanted to purchase more fentanyl pills from WILLIAMS.  Many drug dealers, including CONTEH and WILLIAMS, do not like to discuss the specifics of deals via text message.

34.        WILLIAMS then called CONTEH at 12:55pm and the call lasted three minutes. During this call, based on my training, experience, and knowledge of this investigation, WILLIAMS and CONTEH likely worked out the price and quantity of another drug deal.

35.        The next day, March 31, 2024, at 11:35am, WILLIAMS messaged CONTEH, "Lmk bro it's bouta be 12".  CONTEH replied at 1:21pm, "I was knocc bro".  Based on my training, experience, and knowledge of this investigation, these messages indicate that WILLIAMS and CONTEH likely agreed to conduct a deal or to talk again at or before 12:00pm on March 31, but CONTEH slept through the appointment.

36.        At 2:09pm, CONTEH messaged WILLIAMS, "On my way."  At 2:22pm, CONTEH said, "Leave in 20 there's traffic comin from my side."  Based on my training, experience, and knowledge of this investigation, these messages indicate the drive to the meet location was substantially longer for CONTEH, who lived in Alexandria, Virginia, than for WILLIAMS, who lived in Fredericksburg, Virginia.

37.        At 2:41pm, WILLIAMS messaged CONTEH, "I'm out hea."  CONTEH replied, "I'm on route 1" then "Traffic," indicating CONTEH was still enroute to the meet location at 2:41pm.  Route 1 is the same route CONTEH took to the meeting with WILLIAMS on March 26, 2024. Based on my training, experience, knowledge of this investigation, and previous communications, CONTEH and WILLIAMS likely conducted another drug transaction at or near

11

the same location in Fredericksburg, Virginia on March 31, 2024.

38.    Approximately 17 minutes later, at 2:58pm, CONTEH sent $1,050 to ANCRUM via CashApp with the peer-to-peer comment "rent," likely a payment for another 1,000 fentanyl pills received from WILLIAMS.  Moments later, ANCRUM texted WILLIAMS to confirm that she had received CONTEH's payment.  The payment of $1,050 instead of $1,000 is likely the result of the price increase previously requested by WILLIAMS.  $1.10 per pill, as requested by WILLIAMS, would have resulted in a total price of $1,100 indicating CONTEH likely negotiated the price down to $1.05 per pill during their brief phone call the day before.

**F.    *CONTEH's resupply and subsequent controlled purchase on April 4, 2024***

39.    On April 2, 2024, CONTEH sent another $1,050 to ANCRUM via CashApp with the peer-to-peer comment "rent."  ANCRUM again texted WILLIAMS to confirm that she had received CONTEH's payment.

40.    The following evening, on April 3, 2024 at approximately 8:30pm, WILLIAMS messaged CONTEH, "Jus re'd" then, "Jus lyk".  CONTEH replied, "Oready off what u said?".  Based on my training, experience, and knowledge of this investigation, WILLIAMS was letting CONTEH know (as "lyk" stands for "letting you know" that he just "resupplied" meaning he received a new shipment of drugs.  CONTEH's response indicates they previously discussed the shipment. CONTEH had likely already paid ANCRUM for 1,000 fentanyl pills the previous day.

41.    The following morning, on April 4, 2024 at 8:52am, CS-1 messaged agents claiming "[CONTEH] just called me and said come grab this K… He said they just got a new batch he said they got like 30,000".  Based on my training and experience, "K" or "K-pack" means 1,000 fentanyl pills and is a common term amongst drug traffickers and a common amount. Further, based on my training, experience, and knowledge of this investigation as well as WILLIAMS' and CONTEH's own claims, WILLIAMS likely received 30,000 fentanyl pills on or

around April 3, 2024, and CONTEH was likely offering another 1,000 fentanyl pills to CS-1, supplied by WILLIAMS.

42.    On the same date, CS-1 purchased approximately 1,000 fentanyl pills from CONTEH for $1,250 in Alexandria, VA.  Those fentanyl pills were submitted to the DEA's Mid-Atlantic Regional Laboratory for analysis and safekeeping; results revealed the pills contained 84.08 net grams of a substance containing fentanyl.

43.    On April 12, 2024, agents arrested CONTEH for conspiracy to unlawfully, knowingly, and intentionally distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

### G. *CS-2 interactions with WILLIAMS and ANCRUM*

44.    Another DEA Confidential Source ("CS-2") conducted multiple controlled purchases of fentanyl pills from WILLIAMS culminating in WILLIAMS' arrest on August 14, 2024.

45.    During a debriefing, CS-2 told agents that WILLIAMS' "baby-mama" accompanied him during fentanyl deals on multiple occasions.  CS-2 claimed this woman was physically in WILLIAMS' vehicle while CS-2 purchased fentanyl pills from WILLIAMS inside the same vehicle.  Based on CS-2's description of this individual, my experience and knowledge of this investigation and the relationship between WILLIAMS and ANCRUM, CS-2 was referring to ANCRUM.

### H. *July 31, 2024 package mailed from VAZQUEZ to WILLIAMS*

46.    ANCRUM and WILLIAMS routinely texted about what addresses they could use for new drug shipments.  On one occasion on July 25, 2024, ANCRUM texted WILLIAMS the address of a friend of hers in Woodbridge, Virginia.  On July 31, 2024, WILLIAMS texted

13

ANCRUM "My shits gonna be at ur friends house tm".  ANCRUM liked the message then responded "I already told her she off tomorrow too" indicating ANCRUM coordinated not only for the address but also for her friend to receive the parcel on their behalf.

47.     On or about July 31, 2024, shortly after CC-2's arrest, the U.S. Postal Inspection Service (USPIS) seized a package that agents later learned was mailed by VAZQUEZ in Phoenix, Arizona and addressed to the same address of ANCRUM's friend in Woodbridge, Virginia.  The package was addressed to "Rebecca Moore", and the listed sender was "James Richardson."  Both names are believed to be pseudonyms.  USPIS obtained a federal search warrant for the package. The package contained a gift-wrapped box.  Inside the gift-wrapped box was a Bluetooth speaker. Inside the speaker was a gray-in-color bag.  Inside the gray-in-color bag was a clear plastic bag containing suspected fentanyl pills.  The weight, including the plastic bag, was approximately 1,094.5 grams.  The suspected fentanyl pills were then destroyed by law enforcement in accordance with agency protocol.

48.     Additional information confirmed that VAZQUEZ mailed the package to WILLIAMS and ANCRUM.  WILLIAMS took a screenshot of a video chat which clearly shows his face in the bottom right corner of the screen, and a mailing receipt in the middle of the screen. The mailing receipt listed the same tracking number as the interdicted package.  Separately, WILLIAMS and another co-conspirator ("CC-3") saved matching screenshots showing the sender's name ("James Richardson"), recipient's name ("Rebecca Moore"), and the Woodbridge, Virginia address to which the package was mailed.

49.     VAZQUEZ was subsequently arrested in Phoenix, Arizona on August 5, 2025, and charged in EDVA with conspiracy to unlawfully, knowingly, and intentionally distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule

II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

### I.   *August 7, 2024 package*

50.     Following the government's interdiction of the package mailed on or about July 31, 2024, WILLIAMS arranged for another package containing fentanyl pills to be sent from Phoenix, Arizona to his own home of record in Dumfries Virginia.  Before the package was shipped, WILLIAMS sent a text message to ANCRUM with the names of the "Sender" and the "Catcher."

51.     Separately, CC-3 saved two screenshots.  The first contains identical text to that which ANCRUM received, including distinct spaces before and after the hyphen on the first line with the name of the "Sender," but no spaces before and after the hyphen on the second line with the name of the "Catcher."  The second screenshot contains WILLIAMS' home of record in Dumfries, Virginia which was also the destination address used for the parcel.

52.     USPIS ultimately interdicted the package, obtained a federal search warrant for it, and discovered a substantial number of pills.  Lab testing revealed that there were approximately 10,257 fentanyl pills, with a net weight of approximately 1.1 kilograms.

53.     On August 8, 2024, when the parcel was scheduled to be delivered, ANCRUM messaged WILLIAMS reminding him to be careful.  WILLIAMS responded "All you needa worry bout it getting that shit right when it get there…" indicating ANCRUM was also responsible for receiving the parcel.  ANCRUM responded "I'm looking" then "Nothing."  WILLIAMS then sent a screenshot of the USPS Tracking website showing the same parcel was "returned to the sender." WILLIAMS then asked ANCRUM if he should come and attempt to "look for that mail man." ANCRUM responded "No" then "Don't wanna look suspicious."

54.     Additional information confirms the package mailed on or about August 7, 2024 was intended for WILLIAMS.  When the package was not delivered, WILLIAMS asked about the package at a post office in Woodbridge, Virginia.  In doing so, WILLIAMS presented his Virginia

driver's license.

## CONCLUSION

55.     Based on the facts contained in this affidavit, I respectfully submit there is probable cause that, beginning in or around September 2023 and continuing to in or around August 2024, within the Eastern District of Virginia and elsewhere, the defendant, LATAIJA ANCRUM, knowingly and intentionally combined, conspired, confederated, and agreed with others to distribute 400 grams or more of a mixture and substance containing fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Respectfully submitted,

_Kyle Van Hecke_
Special Agent Kyle C. Van Hecke
Drug Enforcement Administration

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on April 15, 2026.

Hon. Ivan D. Davis
United States Magistrate Judge

16